Filed 10/16/25  In re Jossiah R. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Jossiah R. et al., Persons Coming Under the Juvenile Court Law. | B343484 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.R., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. Nos. DK23839D, DK23839E |

APPEAL from orders of the Superior Court of Los Angeles County, Juan M. Valles, Juvenile Court Referee.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's orders terminating her parental rights to two of her children, Jossiah (born August 2011) and Jailenne (born December 2013). Her sole contention is that the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court failed to fulfill their inquiry duties under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California statutes (Welf. & Inst. Code, § 224 et seq.).[1] We affirm.

## BACKGROUND

Mother and father have five children together: Jossiah and Jailenne, and their three older siblings.[2] The children also have adult half-siblings.[3] In July 2017, DCFS placed all five children in protective custody and filed a section 300 petition on their behalf based on mother's alleged drug possession and neglect of the children. Father was incarcerated at the time. As mother had been arrested, the social worker could not interview her about the children's possible Indian ancestry.

On July 11, 2017, mother signed and filed a Parental Notification of Indian Status form (ICWA-020) stating, "I have

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "[W]e use the term 'Indian' throughout to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).) We intend no disrespect.

[2] Although all five children were part of these dependency proceedings, only Jossiah and Jailenne are the subject of this appeal. Father is deceased.

[3] One of the children's half-siblings was 17 years old at the time and a subject of the dependency proceedings.

2

no Indian ancestry as far as I know." At the July 11 detention hearing, the juvenile court noted mother had indicated she had no Indian ancestry. Children's counsel informed the court she had filed a relative caretaker information sheet and also had phone numbers for other relatives whom she would call about placement. The form identified maternal grandmother as a prospective caretaker and listed her address and phone number. The form noted maternal aunt Rocio, paternal uncle Sergio, maternal grandfather, and two children under age 14 also lived in the home.[4] The court ordered the children detained.

On July 21, 2017, at his first appearance, father filed an ICWA-020 form—acknowledged by the court—also stating he had no known Indian ancestry. DCFS's supplemental report, filed that same day, states mother denied Native American Indian ancestry for herself and for the children on April 19, 2017, and on May 10, 2017, father "denied ICWA and stated he is Mexican American." The court found father was the presumed father of the children and ICWA did not apply.

DCFS also informed the court in its July 21 report that it had researched potential relatives for placement, as the court had ordered at the last hearing. The social worker spoke to maternal aunt Rocio, who confirmed she, paternal uncle Sergio, and their two minor children lived in the three-bedroom home with maternal grandmother and grandfather. At the July 21 hearing, minors' counsel informed the court Rocio had asked for Jossiah and Jailenne to be placed with her family. The court ordered the two children to be placed in their relatives'

---

[4] Maternal grandmother spoke only Spanish. Maternal aunt Rocio and paternal uncle Sergio are a couple.

home pending a satisfactory walk-through of the home.  (On September 15, 2017, Jossiah and Jailenne were placed in Rocio's and Sergio's care in their shared home with maternal grandparents.)

DCFS filed its jurisdiction/disposition report on September 22, 2017.  The dependency investigator (DI) interviewed father at his place of incarceration on August 30, 2017.  He denied any Native American heritage.  Father was raised by his parents but his father—paternal grandfather— died in 2003.  Father had a good relationship with paternal grandmother.  He told the DI he had seven siblings:  Carol, Ruben, Sergio, Reina, Bianca, Ashley, and Richard.  Father stated he had been in a relationship with mother for 14 or 15 years.  On September 12, 2017, the DI interviewed mother at her place of incarceration.  She also denied any Native American heritage.  Mother was raised by her parents in Los Angeles.  She had a strained relationship with maternal grandmother—she hadn't spoken to maternal grandmother since she had been in jail—but a good one with maternal grandfather.  Mother had one full sibling—maternal aunt Rocio.  Mother did not have a close relationship with maternal grandmother's other six children.  On September 8, 2017, the DI spoke with paternal grandmother about the petition.

On October 19, 2017, the court sustained DCFS's first amended section 300 petition, except for one count.  That same day, father filed a relative information sheet identifying the telephone numbers for paternal aunts Reina and Bianca.  As reported in DCFS's addendum report filed November 14, 2017, paternal grandmother gave the DI accurate phone numbers for the paternal aunts on October 20, 2017.  The DI spoke to Bianca

later that day, who said she could not care for the children. On October 27, the DI spoke to Reina, who also said she was unable to help with the children.

At the November 15, 2017 disposition hearing, the court declared the children dependents of the juvenile court, removed them from parental custody, and ordered family reunification services for parents. The court terminated family reunification services for both parents on September 13, 2018, and set the matter for a section 366.26 hearing.

In October 2018, a DCFS social worker spoke with maternal aunt Martha about caring for the children. She was unable to do so and gave the social worker maternal aunt Sandra's phone number. The social worker left a message for Sandra on her voicemail. The social worker also spoke with maternal grandmother. Maternal grandmother confirmed Rocio lived in her home and was caring for Jossiah and Jailenne. As maternal grandmother already was helping to care for four children in her household—Jossiah, Jailenne, and Rocio and Sergio's two children—she could not care for the other three siblings. Maternal grandmother told the social worker her daughter Sandra had said she also could not care for the children. Maternal grandmother knew of no other relatives who could. The social worker also spoke to paternal aunt Bianca. Bianca still could not care for the children. When asked about other relatives, Bianca said there were none, as paternal grandmother was unable to care for the children.

DCFS's section 366.26 report, filed December 18, 2018, stated ICWA did not apply.[5] DCFS reported Rocio and Sergio wanted to provide Jossiah and Jailenne with a permanent home through legal guardianship. The DI interviewed the couple on December 8, 2018 at their home. Rocio stated her parents raised her, and she was the youngest of maternal grandmother's children. Sergio stated he was one of nine children and his father had died in 2002. Like father, Sergio said he had a good relationship with his parents.

On March 14, 2019, the court appointed Rocio and Sergio as Jailenne's legal guardians and terminated its jurisdiction over the child. The court also appointed Rocio and Sergio as Jossiah's legal guardians, and terminated its jurisdiction, but not until March 9, 2021.

In April 2023, father filed section 388 petitions asking the court to reinstate his reunification services with Jossiah and Jailenne.[6] The court set a hearing for July 2023. In June 2023, mother also filed section 388 petitions asking the court to resume her reunification services with both children.

In its report, filed June 29, 2023, responding to father's petitions, DCFS reported mother and father both told the DI, on June 26, 2023, that they did not have any Native American Indian ancestry. That same day, Rocio, Sergio, and paternal grandmother each told the DI "there was no Native American

---

[5]     DCFS's later reports repeated that statement. DCFS's section 366.26 report, filed February 26, 2021, stated, "On 9/28/17, the Court found the Indian Child Welfare Act does not apply to this matter."

[6]     Father apparently was released from prison in 2021.

6

Indian ancestry within the family." Father and mother were living at paternal grandmother's home.

The court set a hearing for August 16, 2023, on mother's section 388 petitions and continued the hearing on father's petitions to the same date. DCFS filed an interim review report in advance of the hearing, on August 9, 2023. On August 7, 2023, mother and father again told the DI that neither had any Native American Indian ancestry. On August 8, 2023, Rocio, Sergio, and paternal grandmother again told the DI that there was no Native American Indian ancestry within their families. The court denied father's petitions and continued the hearing on mother's petitions.

In its September 7, 2023 last minute information for the court (LMI), DCFS stated the DI had interviewed one of the children's adult half-siblings about mother's section 388 petition. On September 28, 2003, the court granted mother's petitions in part. The court reinstated its jurisdiction, granted mother six months of reunification services, and ordered mother and father were to have separate, monitored visits with the children. At that hearing, mother's counsel explained mother previously had asked DCFS to approve maternal grandmother as her monitor, but the approval was "stalled and stalled" in part because there was no interpreter. The court ordered DCFS immediately to assess the maternal grandmother as a monitor, as well as any other possible monitors, such as paternal grandmother. In its LMI filed October 26, 2023, DCFS informed the court it was assessing maternal grandmother and maternal grandfather to be potential monitors for mother's visits.

In January 2024, father filed section 388 petitions asking for reunification services. In its interim and status review

reports filed March 13, 2024, DCFS noted that, on March 12 and 13, 2024, mother and father, respectively, again denied having any Native American Indian ancestry.  The reports reiterated the Indican Child Welfare Act did not apply.

In its March 28, 2024 LMI, DCFS informed the court that legal guardians maternal aunt Rocio and paternal uncle Sergio were interested in adopting Jossiah and Jailenne.  The children also wished to be adopted.  DCFS recommended the court terminate reunification services.

At a hearing on March 28, 2024, the juvenile court stated, "The court has reviewed the file and finds no reason to know or believe that this case is governed by the Indian Child Welfare Act."  The court denied father's section 388 petitions, terminated mother's reunification services, and set the matter for a section 366.26 hearing.

Father died on May 20, 2024.

At the July 31, 2024 section 366.26 hearing, the juvenile court stated, "The court has again reviewed the file and continues to find no reason to know or believe that this case is governed by the Indian Child Welfare Act."  The court's minute order from the hearing states, "The Court continues to find that ICWA does not apply in this matter."  The court continued the matter pending DCFS's receipt of father's death certificate.  The court reiterated its no-ICWA finding as to Jossiah and Jailenne at the continued September 26, 2024 hearing and continued the matter again.

DCFS filed father's death certificate with the court on December 3, 2024.  The certificate identifies father as Mexican and his race as Mexican-American.  It also states paternal grandfather was born in Durango, Mexico.

On the eve of the January 14, 2025 section 366.26 hearing, mother filed section 388 petitions asking for further reunification services. The court summarily denied them. At the section 366.26 hearing, the court reiterated "its prior no ICWA findings." The juvenile court terminated mother's parental rights and designated Rocio and Sergio as the children's prospective adoptive parents. Mother appealed.

## DISCUSSION

Mother contends DCFS did not comply with its initial duty of inquiry because it failed to ask extended relatives with whom it had contact about the children's possible Indian ancestry. She thus asks us to reverse the orders terminating her parental rights as to Jossiah and Jailenne and remand the matter to the juvenile court for DCFS to make an ICWA inquiry of known and extended relatives.

**1.** ***Applicable law and standard of review***

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' " (*Dezi C., supra*, 16 Cal.5th at pp. 1128–1129, quoting 25 U.S.C. § 1902.) An " 'Indian child' " is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also § 224.1, subd. (a).)

DCFS and the juvenile court "have 'an affirmative and continuing duty' in every dependency proceeding to determine

9

whether ICWA applies by inquiring whether a child is or may be an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131–1132, quoting § 224.2, subd. (a).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.) Only the initial duty is at issue here.

DCFS's "duty arises when a report of abuse or neglect is made and/or when the county takes the child into its temporary custody." (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1099 (*Kenneth D.*).) This initial duty of inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).)[7] And "on the first appearance upon a petition, 'the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child.' " (*Kenneth D.*, at p. 1099, quoting § 224.2, subd. (c).)

The juvenile court may find ICWA does not apply to a child's proceeding if it finds DCFS's "inquiry and due diligence were 'proper and adequate,' and the resulting record provided

---

[7] Extended family member "has the same meaning as defined by the law or custom of the Indian child's tribe," if such a law or custom exists. (§ 224.1, subd. (c)(1).)

no reason to know the child is an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134; § 224.2, subd. (i)(2).)  The juvenile court's finding that ICWA does not apply thus " ' "implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

We generally review the juvenile court's factual finding that ICWA does not apply for substantial evidence.  (§ 224.2, subd. (i)(2) [juvenile court's finding that ICWA does not apply to the proceedings is "subject to reversal based on sufficiency of the evidence"]; see also *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004–1005 (*Ezequiel G.*) [reviewing juvenile court's finding that it had no reason to know a child is an Indian child for substantial evidence but reviewing decision that ICWA inquiry was adequate for abuse of discretion], disapproved on another ground in *Dezi C., supra*, 16 Cal.5th at p. 1152, fn. 18; *Dezi C.,* at p. 1134 [declining to decide applicable standard of review].)

"[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141, quoting *Ezequiel G., supra*, 81 Cal.App.5th at p. 1005.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*Kenneth D., supra*, 16 Cal.5th at pp. 1101–1102.)  Our high court thus has held, "[i]f, upon review, a juvenile court's findings that an inquiry was adequate

11

and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error." (*Dezi C.*, at p. 1141.)

## 2. *Analysis*

Substantial evidence in the record before the juvenile court supports its finding that ICWA did not apply to Jossiah or Jailenne. Mother and father each filed ICWA-020 forms denying Indian ancestry—which the court confirmed at their initial appearances—and, on five separate occasions between 2017 and 2024, each denied having Indian ancestry in response to DCFS inquiries. Twice in 2023, maternal aunt Rocio told the DI there was no Indian ancestry "within the family," and paternal uncle Sergio and paternal grandmother told the DI their family also had no Indian ancestry. Nothing in the record calls into question the credibility of these statements.

Mother's primary complaint is that, although DCFS contacted maternal grandmother and grandfather—in whose home the children lived—and maternal aunts Martha and Sandra, paternal aunts Reina and Bianca, and one of the children's adult half-siblings, the record does not indicate DCFS asked any of these relatives about possible Indian ancestry.

True, DCFS did not ask every relative with whom it came into contact about the children's possible Indian ancestry. Mother notes our high court in *Dezi C.* clarified that section 224.2 does not require DCFS to locate and interview " 'every possible extended family member,' but only those who are ' ["]reasonably available to help the agency with its investigation.["] ' " (Quoting *Dezi C., supra*, 16 Cal.5th at p. 1140.) The *Dezi C.* court explained, " '[t]he operative concept is those people who are reasonably available to help the agency with its investigation

12

into whether the child has any potential Indian ancestry should be asked.' " (*Ibid.*) We conclude that is what happened here.

As to paternal relatives, DCFS asked paternal uncle Sergio and paternal grandmother about the family's Indian ancestry and both confirmed the family had none. The paternal grandfather died years earlier in 2003. As mother notes, father gave DCFS the names of his many other siblings, and DCFS had contact with paternal aunts Bianca and Reina. Mother contends DCFS's ICWA inquiry was inadequate because there is no indication DCFS asked Bianca or Reina about the family's Indian ancestry or tried to contact father's other siblings. Mother also contends DCFS did not question anyone about whether paternal grandfather had Indian ancestry through his side of the family.

We disagree. Nothing in the record suggests father's other siblings would have had more or different information about the family's Indian ancestry than what father or paternal uncle Sergio—and paternal grandmother—already had provided. Thus, the juvenile court reasonably could conclude there was no need for DCFS to "duplicate inquiry efforts" by asking father's other siblings about ICWA. (*In re C.R.* (2025) 112 Cal.App.5th 793, 802.)[8] As for deceased paternal grandfather's ancestry, Sergio told the DI there was no Indian ancestry *within the family*. He was raised by both his parents and said he had a good relationship with them. Reasonably, the juvenile court

---

[8] For the same reasons, we conclude the juvenile court could find it was unnecessary for DCFS to question mother's half-siblings and the children's adult half-siblings about ICWA —nothing in the record suggested they would know more about the children's possible Indian ancestry than mother or her full sibling.

13

could conclude that by "family," Sergio was including paternal grandfather and his side of the family. Accordingly, we disagree with mother's statement that "no one inquired whether [paternal grandfather] had Indian ancestry through his side of the family." We thus conclude the juvenile court did not abuse its discretion in implicitly finding DCFS's ICWA inquiry of the children's paternal relatives was proper and adequate.

The juvenile court's assessment of DCFS's inquiry into Indian ancestry on mother's side of the family is a closer call. We nevertheless conclude DCFS's inquiry of mother and maternal aunt Rocio was sufficient for the juvenile court "to reach a reliable conclusion" that ICWA did not apply. (*Dezi C., supra*, 16 Cal.5th at p. 1153 (conc. opn. of Kruger, J.).) As we have explained, "the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's . . . inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1009.) Moreover, our high court has made clear that reversal is not "require[d] . . . in all cases in which every possible extended family member has not been asked about the child's Indian ancestry." (*Dezi C.*, at p. 1140; see *id.* at p. 1141 [declining "to decide what constitutes an adequate and proper inquiry necessary to satisfy section 224.2"].)

As mother asserts, nothing in the record indicates DCFS asked maternal grandmother or grandfather about the children's possible Indian ancestry. However, mother repeatedly denied having Indian ancestry, and maternal aunt Rocio consistently told the DI there was no Indian ancestry within the family. Rocio lived with maternal grandparents. Reasonably, we can infer the juvenile court found Rocio learned about her family's ancestry

14

directly from maternal grandparents, who raised her and with whom she still lived. Section 224.2 "does not require inquiry with every adult living extended family member." (*In re H.B.* (2023) 92 Cal.App.5th 711, 720 ["[The statute] is not intended to obligate county welfare departments to search for possible Indian ancestry without regard to cost or other practical considerations. Rather, it is intended to ensure social workers 'ask an added question of extended family members whom [they] often already are investigating in their usual course of work.' "].)

Moreover, maternal grandmother spoke only Spanish. In September 2023, mother's counsel informed the court DCFS had never assessed maternal grandmother as a monitor because there was no interpreter. The record indicates a social worker was in touch with maternal grandmother in October 2018 about acting as a caregiver for the children's siblings, and then in late October 2023, after the court ordered DCFS to assess whether she could act as a monitor. The court reasonably could find the language barrier with maternal grandmother made it difficult for the social worker simply to " 'ask an added question' " (*In re H.B., supra*, 92 Cal.App.5th at p. 720) about maternal grandmother's ancestry. In other words, maternal grandmother was not " 'reasonably available to help' " DCFS in its investigation. (*Dezi C., supra*, 16 Cal.5th at p. 1140.) The record does not indicate whether maternal grandfather also spoke Spanish. But even if he spoke English, we find no abuse of discretion in the court having found DCFS's inquiry was adequate without maternal grandparents' input. DCFS's " 'obligation [was] only one of inquiry and not an absolute duty to ascertain or refute Native American ancestry.' " (*Id.* at p. 1143.) Based on the record evidence before it, the juvenile

15

court reasonably could find mother's and her younger sister Rocio's consistent denials of Indian ancestry were reliable indicators that the children had no Indian ancestry through mother's family.

Citing *In re K.H.* (2022) 84 Cal.App.5th 566 and *In re Ricky R.* (2022) 82 Cal.App.5th 671,[9] mother contends the juvenile court's implicit finding that DCFS's inquiry was adequate and proper "rest[ed] on a cursory record and a patently insufficient inquiry" and thus lacked substantial evidence. We disagree. In *In re K.H.*, the social services agency asked only the parents— who "were in the throes of serious drug addiction"—about their Indian ancestry despite having had contact with maternal grandmother and paternal grandfather, as well as information about other relatives. (*In re K.H.*, at pp. 587, 592, 599–600, 605.) The agency conceded its ICWA inquiry was inadequate. (*Id.* at p. 587.) Similarly, in *In re Ricky R.*, the agency conceded it had "failed to discharge its duty of initial inquiry." (*In re Ricky R.*, at pp. 675–676.) There, the agency asked both parents and mother's cousin about Indian ancestry but did not inquire of any paternal relatives, or maternal grandmother, great-aunt, or aunt. (*Id.* at pp. 676–677, 680.) Even in *Dezi C.*, the agency conceded its inquiry fell "well short of complying with section 224.2" where it asked only the parents about their Indian ancestry. (*Dezi C., supra*, 16 Cal.5th at p. 1141.)

Here, in contrast, not only did parents repeatedly deny having Indian ancestry, but maternal and paternal relatives confirmed there was no Indian ancestry within the children's family. Moreover, the social services agencies in *Dezi C.*,

___

9    Disapproved on another ground in *Dezi C., supra*, 16 Cal.5th at p. 1152, fn. 18.

16

*In re K.H.*, and *In re Ricky R.* all conceded their initial inquiries were inadequate. That is not the case here. Accordingly, we do not conclude DCFS's initial inquiry was "patently insufficient," as mother argues.

Jossiah and Jailenne were only six and three years old when DCFS took them into protective custody eight years ago. They now have spent more than half their young lives outside of their parents' care. DCFS's ICWA inquiry was not perfect. But substantial evidence supports a finding that mother's and father's repeated denials of Indian ancestry, along with maternal aunt Rocio's, paternal uncle Sergio's, and paternal grandmother's confirmation that no Indian ancestry existed within their families, "reliably answered" the question of whether the children were Indian children. (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1009.) Accordingly, we conclude the juvenile court did not abuse its discretion in impliedly finding DCFS's ICWA inquiry was proper and adequate under section 224.2 and that ICWA did not apply. We can see no reason why these children should have to wait a moment longer for the stability and permanency adoption by their aunt and uncle will provide.

## DISPOSITION

We affirm the juvenile court's January 14, 2025 orders terminating mother's parental rights.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

HANASONO, J.

18